### KOEHLER v. NEW YORK STEAM CO.

(Supreme Court, Appellate Division, First Department. June 5, 1903.)

1. MASTER AND SERVANT—DEFECTIVE APPLIANCES—LIABILITY OF MASTER—
   NEGLIGENCE OF FELLOW SERVANT.
   Where, in an action for the death of a servant caused by the bursting of a steam-pipe elbow, it was made to appear that the elbow which burst was of proper design and material and made by reputable manufacturers, and also that defendant had made provision for the inspection thereof by competent servants, it could not be held liable though the elbow was in fact defective, and this whether the inspection was or was not duly performed by the servant to whom it was committed.
   Hatch, J., dissenting.

Appeal from Trial Term, New York County.

Action by Elizabeth Koehler, as administratrix of John Koehler, deceased, against the New York Steam Company. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Reversed.

Argued before HATCH, McLAUGHLIN, O'BRIEN, INGRAHAM, and LAUGHLIN, JJ.

Frank Verner Johnson, for appellant. .
Edward A. Alexander, for respondent.

O'BRIEN, J. The action was brought to recover for the death of the plaintiff's intestate from injuries received while in defendant's employ. The facts and incidents leading up to the accident were fully brought out on the former trial and reviewed by this court on appeal (Koehler v. New York Steam Co., 71 App. Div. 222, 75 N. Y. Supp. 597), and it is therefore unnecessary to again state them.

The negligence with which the complaint charged the defendant was in using a defective elbow without properly inspecting and testing it, and in failing to make and enforce rules which would protect its employés while working. Upon this new trial the only issue seriously litigated was whether the elbow burst by reason of its defective condition, and whether the defendant could have discovered such condition by the exercise of reasonable care. We say that was the only question seriously litigated, because, although there was some evidence which tended to show that no special rules were made or at-

¶ 1. See Master and Servant, vol. 34, Cent. Dig. §§ 406, 408, 409.

tempted to be enforced which would have guarded against the striking of the elbow while under steam pressure (which it was testified might cause a bursting of the pipe), the plaintiff did not attempt to show that the accident was caused by such striking of the elbow, and from the plaintiff's point of view, therefore, and upon the proof adduced, it is not material to follow a discussion in reference to the making and enforcement of any such rules, because it is not claimed that the accident resulted from a failure to make and enforce them. It did appear that on the morning following the accident there were found certain marks or indentations upon the elbow, and the defendant made considerable point of this fact, and contended that a more probable explanation than the one offered by the plaintiff—which was based upon the original defect in the elbow—was that, while working in the trench, and placing therein, under the pipe that burst, another main, the workmen, with tools or heavy bars, struck the pipe, and this, under the then pressure of steam, would, as stated, have caused the bursting. There was the suggestion of a third theory, namely, a defective connection due to too great tightening of the elbow, and the possibility of such bursting resulting from a water hammer was referred to; but as neither side relied upon either of these theories, and they were only incidentally introduced, we may dismiss them from consideration.

We are brought back, therefore, to the consideration of whether or not the plaintiff, upon the point to which her evidence was directed, and upon which she claims to be entitled to recover, sustained the burden of showing, by a fair preponderance of evidence, that the bursting of the elbow was due to its original defective condition, which, by the exercise of reasonable care, could have been discovered. In speaking of this, the plaintiff's, theory of the accident, the learned trial judge instructed the jury:

"If you find that this accident happened from any cause except a defect in the elbow, that is, by any cause brought about by an act of a fellow servant, the defendant is entitled to your verdict. * * * If you find that to be the case (that the elbows were submitted by the defendant's employés to the hammer test), the defendant is entitled to your verdict, because there would appear to have been nothing omitted. * * * If it was not caused by the negligence of the defendant, but was caused by the negligence of a fellow servant by a blow of a hammer, or any cause except a latent defect in the pipe, then the defendant is entitled to a verdict."

And in reference to the obligation devolving upon the defendant the court further said: "It was a duty cast upon the defendant to furnish reasonably safe appliances"—and competent men.

In considering the issue thus litigated, it is important to keep in mind the burden which the plaintiff assumed, and which she was obliged to sustain in order to fix liability upon the defendant. Upon her theory it was essential to prove three things: First, that there was a defect originally in the casting; second, that this defect was the proximate cause of the bursting of the elbow; and, third, that, had the defendant used reasonable care and applied the hammer test or other suitable test, the defect could have been discovered.

There was no dispute but that upon examination of the surface of the fracture after the accident there was discovered a small area in

the interior of the metal on the short side, or what is known as the "neck," of the casting, which had what was termed a "spongy appearance." This condition, the evidence further shows, is more or less common in all castings, and, to guard against it, it is usual, where the elbow is designed to withstand pressure, to have the casting of sufficient thickness to make it eight or ten times stronger than is actually necessary to sustain the required pressure. The plaintiff insisted that this sponginess or spongy condition was a defect which, though latent, could have been discovered by the application of what is known as the "hammer test," and that it was the weakness of the casting due to this spongy condition that was the cause of the bursting of the elbow. The defendant, on the other hand, contended that the spongy condition was in no sense a defect which contributed to the accident, and that, not being on the surface, it was not discoverable by the hammer test, and, considering the strength and thickness of the elbow, it could not have been affected to the extent of bursting by the pressure of steam to which it was subjected.

The plaintiff, in support of her theory, produced two experts, one of whom was a managing engineer for chemical works, and the other a consulting engineer and consulting metallurgist. The defendant produced four experts, who, after examination of the elbow, concurred in the view that it was of proper size and material and in every way suitable for the purposes for which it was used, and that the accident could not be attributed to the spongy appearance which was notable in a part of the elbow, and that the elbow as broken disclosed no defect which could have been discovered by the hammer test or by any of the usual and customary tests that are applied to castings, and that the spongy appearance, when of small extent, as they found it in this elbow, did not materially diminish the strength of the casting.

While the defendant's witnesses, in point of numbers and weight, preponderate over those brought by the plaintiff, we should hesitate to disturb this verdict if it rested entirely upon this disputed question of fact as to whether the bursting was or was not due to the original latent defect in the elbow or casting. If we were, however, to take the verdict of the jury in favor of the plaintiff as conclusive upon this disputed question of fact, and start with the proposition that the accident and bursting of the elbow were due to an original defect in the casting, we are obliged to go one step further and determine whether or not in the use of this casting the defendant was guilty of negligence.

It is important that we should have in mind the extent of the obligation resting upon the defendant. As said in Byrnes v. N. Y. L. E. & W. R. R. Co., 113 N. Y. 256, 21 N. E. 51, 4 L. R. A. 151:

"The master is not an insurer that all his servants shall perform their duty, and he performs his duty to the servant in this regard in providing a system of inspection and intrusting its performance to competent hands. If, thereafter, such servants are guilty of negligence, the master is not responsible therefor to a co-servant."

See, also, Ford v. L. S. & M. S. R. R. Co., 117 N. Y. 638, 22 N. E. 946; Carlson v. Phœnix Bridge Co., 132 N. Y. 273, 30 N. E. 750; Harley v. Buffalo Car Co., 142 N. Y. 31, 36 N. E. 813; Biddiscomb

v. Cameron, 35 App. Div. 561, 55 N. Y. Supp. 127, affirmed 161 N. Y. 637, 57 N. E. 1104; Smith v. N. Y. C., 164 N. Y. 491, 58 N. E. 655.

In Biddiscomb v. Cameron, supra, where an employé was killed owing to a defective elevator clutch, Mr. Presiding Justice Van Brunt, writing the opinion of this court, said:

"The defendants were not insurers of the safety of the appliances provided by them, but they were bound to use reasonable diligence in providing safe appliances for the use of their employés. * * * It is urged upon the part of the appellant that the machinist was not a proper person to conduct such an examination, and that he could not judge as to whether the clutch was in good order or not. The evidence upon the part of the plaintiff, however, shows that the clutch was not an intricate piece of machinery by any means, and that an ordinary inspection by a competent man would enable him to discover whether it was in working order, and there is no evidence but that Gill, the machinist, was qualified as such. * * * The theory of the plaintiff, as stated by counsel, seems to be that a master must see that the place where his servant works, or the appliance with which his servant is provided, or the machine he operates, is safe. We are not aware of any such rule which makes the master an absolute insurer of the safety of the appliance and of the place where his servant works. As has already been stated, he is bound to use reasonable care in this regard, and that is all that the law requires."

Reading the record with a view of determining whether the defendant here observed that degree of reasonable care and prudence which rested upon him, not alone in the purchase and selection of the castings, but also in respect to providing for inspecting and testing them after they were purchased, we find the evidence to be uncontradicted that the defendant furnished for the pipe line which he was then constructing cast-iron elbows manufactured by reputable makers after its own patterns, which were 40 to 50 per cent. heavier than the standard elbows in common use for that purpose. It was thus made to appear that the elbow which burst was of proper design and material, and made by reputable manufacturers. And it was also shown that after the castings were received from the manufacturers it was incumbent upon one of the employés of the defendant, who showed by his testimony that he was competent to perform that duty, to examine each casting, and to apply the proper test to ascertain what, if any, defect might exist therein. On this latter subject the machinist in the defendant's employ who had that duty imposed upon him testified:

"When they [the castings] come from the foundry we take hold of them and examine them, put them in the reaming machine, tap them, take them upstairs, wash them out, go over them again, and turn them into the storeroom. This [referring to the one that burst] is one of the castings that went through that process. I mean by tapping them, putting a thread in them; you ream them out first, to make a hole of the proper size; then you tap them a certain size, and you cut the threads inside of them, and bring them upstairs and wash them, and go over them again and look at them to see if they show any defects. I ascertain if there is any defect. First off, I ascertain with a hammer—give them a good hammering; then when the reamer goes in I test them again, because it cuts the scale off the iron, and if anything bad shows in them they are thrown out."

And the defendant's foreman testified, referring to the elbow:

"That came from the storeroom. I saw it that morning when it came— when it came on the job. I examined it. I generally look them over, and test them with a hammer."

Upon the subject of inspection, therefore, we have the uncontradicted evidence that the defendant had placed in competent hands the duty of inspecting the castings, and, if the testimony is to be credited, such duty was in this instance fully performed. It may be said, however, that these witnesses were not entirely disinterested, and the jury were at liberty to say whether they had or had not discharged the duty of inspection. The turning point, however, is not whether they did or did not neglect their duty, but whether or not the defendant failed in its duty; and, it here affirmatively appearing without contradiction that the master observed not only care in the selection of the material, but in the provision which was made for inspection, it would make no difference as to its liability whether the inspection was or was not duly performed by the servant to whom it was committed. As stated in Byrnes v. N. Y. L. E. & W. R. R., supra, from which we have already quoted: "If, thereafter, such servants are guilty of negligence, the master is not responsible therefor to a co-servant."

There being no dispute, therefore, but that the defendant selected competent men whose duty it was to inspect the castings received, the verdict of the jury, which, in effect, found that this obligation had not been performed, is so clearly against the weight of evidence that upon this ground it must be set aside, and the judgment and order reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur, except HATCH, J., who dissents.